Nanette Dembitz, J.
This is a motion by respondent juveniles, at the close of a juvenile delinquency proceeding against them, for an order directing the expungement of all court and police records relating to it and to their arrests.
The police took the 14- and 15-year-old respondents into custody during a demonstration in front of a public school. Then, the proceeding in this court was initiated by juvenile delinquency petitions, attested by policemen, alleging acts by respondents which would constitute, if committed by adults, the crimes of unlawful assembly and riot, under sections 240.05 and 240.10 of the Penal Law. At the opening of trial, counsel for the New York City Police Department, representing the petitioners, was granted permission to withdraw the petitions, on his motion on the ground that he did “ not believe that we have enough evidence here to make out a prima facie case.” Respondents’ present motion to expunge the court and police records relating to the petitions and to their arrests, contends that these records will stand as obstacles to respondents’ progress for years to come, particularly if they seek public employment after completing school.
While respondents’ motion presents judicial questions of first impression, the handicap of a juvenile court record or a police record, to a youth trying to gain a foothold in the job market, has concerned commentators on justice for juveniles and the underprivileged.[1] The most frequent respondents in juvenile delinquency cases in New York City, as elsewhere, appear to be children of the minorities and of the poor, as indeed are the instant respondents. The court obviously cannot determine this case on the basis of the general social commentaries cited by respondents’ diligent counsel. However, having considered the instant circumstances, the legal grounds for relief, and the jurisdiction of this court, it has concluded that the motion should, with some modifications in the requested remedy, be granted.
*200 A. employers’ access to court akd police records
Despite the prohibition on inspection of Family Court files,[2] employers secure knowledge of a juvenile delinquency petition in a job applicant’s past, through a simple expedient — requiring him, as a condition of seeking employment, to obtain a Court Clerk’s certificate of his record in this court.[3]
As to arrest records, the New York City Police Department’s regulations on confidentiality explicitly make exceptions for the release of information, in the discretion of the commanding officer, to the New York City Department of Personnel, the United States Civil Service Commission, the State Liquor Authority, and to any city agency as to any incumbent employee (Regulations of New York City Police Dept., c. 2, par. 6.0). The regulation does not differentiate between juvenile and adult arrest records, which are maintained in separate files but on the same forms and in the same central office.
While a police spokesman stated that the discretion to release information to the specified agencies about job applicants is not presently exercised, it appears that the practice varies from time to time (see Matter of Adler v. Lang, 21 A D 2d 107, 108). In any event, there is no question that arrest records are made available as to applicants for employment in the Housing, Transit or City Police or any other “ uniformed service ” (e.g., firemen, court officers), and also as to applicants to the Police Department’s licensing division for hack owner’s or driver’s licenses.
With respect to private employers, there is reason to doubt that the prohibition on access to police arrest records is rigidly enforced.[4] Additionally, arrest records unquestionably are disclosed to any employer who obtains a waiver of confidentiality from the job applicant.
*201 B. HANDICAP TO RESPONDENTS PROM THEIR COURT AND POLICE RECORDS
While a Court Clerk’s certificate would show that the juvenile delinquency petitions against respondents were “withdrawn” and this termination might also be inserted on the police arrest records, knowledge of this outcome would be unlikely to dissipate a potential employer’s suspicions and doubts as to respondents’ reliability. Employers, like the general public, tend to conclude from a charge and an arrest that ‘ ‘ where there is smoke, there must be fire,” and they may automatically disqualify applicants with arrest records when there are sufficient untarnished applicants.
Thus, even with the fair standards and procedures required of the New York City Civil Service Commission, it nevertheless disqualified an applicant for employment, in part because of an arrest on a charge that was later dismissed — and there the arrest and the dismissal occurred 10 years before the application for employment (Matter of Adler v. Lang, 21 A D 2d 107, 112). (See, also, Matter of Cuccio v. Department of Personnel-Civ. Serv. Comm of City of N. Y., 40 Misc 2d 345,. 346-347.)[5] Indeed, “ about 75% of the employment agencies sampled in the New York City area * * * do not refer any applicant with a record regardless of whether the arrest was followed by a conviction.”[6] While less specific data are available as to the consequences of juvenile than of adult arrest records, it would seem that they are equally onerous, depending on the stage of life of the job seeker.
C. GROUNDS FOR JUDICIAL RELIEF
Thus, in the economic world that respondents must prepare to enter, there tends to be a presumption of guilt from an arrest record, rather than the presumption of innocence that in the *202 world of legal theory prevails until conviction.[7] On the instant motion, this court — like respondents,, their parents, and their community — must concern itself with the law in action, with the true impact, whether intended or unintended, of the system of justice upon their lives.
1. For an employer to draw any suspicion or inference of respondents’ misconduct from their arrests and delinquency petitions, would be especially unfair, because the withdrawal of the petitions was due to a complete lack of evidence rather than a mere procedural snag[8] (this court noticing that, in practice, petitioners attempt to establish a prima facie case if they have even a scintilla of evidence). Accordingly, respondents’ motion is supported by analogy to the judicial power to grant protection against injury from a false, defamatory connotation.[9]
2. Since there is no evidence of respondents ’ misconduct, there is no public interest from a law-enforcement standpoint in maintaining these records, except for statistical purposes (that is, without preserving respondents’ names on them). See Wheeler v. Goodman (306 F. Supp. 58, 65-66): “ Criminal investigation is not subserved in the least by retention of the files ’ ’ of persons who have “ committed no crimes.”
' Any reliance by law-enforcement officers on respondents’ arrest records not only would be unsound, but also might be seriously harmful. For respondents’ arrest records would render them a likely focus of police suspicion in the event of any neighborhood illegality; the records would tend to pin on them the burdensome — and sometimes self-fulfilling[10] — tag of “ trouble-maker.”
In sum, the court and police records in their present form pose threats of injury to the respondents, without justification in the public interest in law enforcement — and indeed contrary to the public interest in helping deprived youths climb out of the poverty ghetto. Accordingly,, a second and significant basis for relief for respondents is that the State’s maintenance of the *203 records constitutes an infringement of the constitutional guarantees of due process and equal protection of the law.[11]
3. Besides the above general grounds for judicial relief, respondents, as juveniles, can voice a special plea. Mindful of the stresses, spontaneity, and plasticity of youth, the draftsmen of the Family Court Act sought to forestall future handicaps for young people even from adjudications of delinquency (see § 783); a fortiori the juvenile should be protected against the effects of a withdrawn petition. Again, the act attempts to safeguard juveniles from adverse use of their arrest records (§ 784), and indeed to prevent the very existence of a juvenile “arrest” record,, by using the phrase “taken into custody” instead of “ arrest ” (Family Ct. Act, §§ 721-724). Certainly, these provisions were intended to be more than ‘ ‘ an empty gesture ” (see Matter of Adler v. Lang, 21 A D 2d 107, 110-111, supra; also Anonymous v. New York City Tr. Auth., 4 A D 2d 953); and the courts must effectuate the legislative intent when it is frustrated by unforeseen practices.
4. It might be argued that relief is inappropriate because there has been no proof of the imminence of injury to respondents from the instant records. But the appearance as well as the actuality of fairness is essential in the administration of justice.[12] To maintain records of unproven charges against respondents appears unfair, because of the potential harm from these waste products of the legal system, even if they are never in fact used adversely. Respondents should be freed from the fear of an unfair handicap in securing employment — particularly in the civil service, which offers a primary path for upward mobility to minority youths like respondents.
Furthermore, it is unfeasible to condition relief on an actual or imminent adverse use of the records, because respondents may be unaware that their records are the cause of a rejection for employment. (Cf. Serralles v. Viader, 149 N. Y. S. 2d 175, affd. 285 App. Div. 947.) Thus, orders of expungement have been issued without such a showing, so that an arrestee would not be “ haunted ” indefinitely by his record (see United States v. Kalish, 271 F. Supp. 968, 970).
While there is a division of authority as to the instant type of motion, this court holds that respondents are entitled to relief *204 with respect to their records on the four grounds above stated; further, that relief in the form of expungement should be granted, because an order merely prohibiting dissemination of their court and arrest records would be inadequate.[13] -Respectfully disagreeing with Matter of Weisberg v. Police Dept. (46 Misc 2d 846, 847), in this court’s opinion an expungement order based on an adversary proceeding does not conflict with the salutary statut.es prohibiting public officers, on their own, from destroying public records.
D. PROPRIETY OF GRANT OP RELIEF BY THIS COURT
Clearly this court, like all courts, has inherent power over its own records, including the power to expunge or obliterate them. (See Matter of Roy M, 33 A D 2d 232; Bohlen v. Metropolitan El. Ry. Co., 121 N. Y. 546, 550; Matter of United Elec. Workers, 111 F. Supp. 858.) And relief in the instant case is dictated by the principle that a court must exercise its power over its records when necessary to prevent injustice and unwarranted injury — that a court “will not allow itself to be made the instrument of wrong ”. (See Matter of Hogan v. Supreme Ct., 295 N. Y. 92, 96.)
This court’s power to order a change in the Police Department’s juvenile arrest records, is implicit in the authority granted it in section 784 of the Family Court Act as to their inspection, which has received a broad construction.[14] Such power should also be deemed ancillary to the court’s broad powers in juvenile delinquency cases. A major criterion as to ancillary jurisdiction is whether the court needs the additional authority in order to implement its decisions (see Morrow, 417 F..2d 728 [cited above, note 6] at pp. 739-740). Certainly this court’s governance of respondents’ arrest records is necessary to secure to them the full benefit of its order approving withdrawal of the petitions. And this court’s control of the *205 effects of a juvenile arrest is highly appropriate, considering that the arrest is merely preparatory and preliminary to a court proceeding.
This court, therefore, rejects the argument that only a court of general equitable jurisdiction has the power to direct a change in the police records, and it holds that it has concurrent authority over them as well as over its own records. The Family Court was intended to have wide powers and wide discretion ‘ ‘ so that its action may fit the particular needs of those before it” (Family Ct. Act, § 141). With this function and with its expertise on the dilemmas facing underprivileged youth, it is incumbent upon this court to undertake responsibility for fulfilling the hope and the promise that a youth will suffer no impediments in his future because of his juvenile record. .
E. FORM OF ORDER
In order to preserve, with a minimum of administrative effort, a record of the petitions and arrests for use in statistical or other surveys, the requested destruction of the records herein will not be directed. Appropriate and adequate relief will be secured by the physical obliteration of the surnames of respondents and of their parents from the docket books, files, cards and all other records in the office of the Clerk of this court and the offices of the Police Department (except for the court petition itself), such obliterations to be made in the presence of respondents and/or their attorney at a time convenient to the parties within 30 days. The Clerk of this court is to place the petitions in a sealed file separate from the regular petition files.
The reason for preservation of the petition is that employers frequently commence their investigation of an applicant by asking him if he has ever been arrested or taken into custody or appeared in court. Complete protection for respondents and other juveniles from unfair discrimination, due to untenable arrests and dismissed charges, can only be afforded by a statutory prohibition on employers’ inquiries or a statutory procedure for nullifying abortive arrests.[15] Absent such legislation, job applicants who admit an arrest may be rejected out-of-hand (see above, at note 6) ; if the employer is willing to make further *206 inquiry, however, it would be to respondents ’ interest to secure a certificate detailing from the indorsements on the petition the precise history of this proceeding.

. E.g., Sparer, Employability and the Juvenile “ Arrest ” Record (Pub. by Center for Study of Unemployed Youth, N. Y. Univ. Grad. Seh. of Social Work, 1966); Note, Juvenile Delinquents: The Police, State Courts, and Individualized Justice, 79 Harv. L. Rev. 775, 801; Gough, Expungement of Adjudication Records of Juvenile and Adult Offenders, Washington Univ. L. Q. [1966], 156, 171 — 172. Cf. Matter of Hambel v. Levine, 243 App. Div. 530.

. See Family Court Act, § 166; Note cited note 1, as to directive of Administrative Judge Florence M. Kelley on strict confidentiality of juvenile records in the New York City Court.

. And the Armed Forces secure the Family Court record of an applicant for enlistment hy requiring him to sign a waiver of confidentiality.

. See Matter of Campbell v. Adams (206 Misc. 673, 674). It is so well known in New York City that private investigators can secure police arrest records (and this court having seen records thus obtained), that this court takes judicial notice of this circumstance. As to the theoretical privacy of police records (see Matter of Sears Roebuck & Co. v. Hoyt, 202 Misc. 43, 48; Hale v. City of New York, 251 App. Div. 826; New York City Charter, § 1114).

. While a spokesman for the incumbent New York City Civil Service Commissioners stated that current policy is to ignore arrests, he noted that even the present Commissioners are unable to prevent consideration of arrests by the employer-agencies, which have discretion to select one out of each three eligibles. (Cf. Matter of Strong v. Kennedy, 29 Misc 2d 54, 55.)

. The Challenge of Crime in a Free Society (Pres. Comm, on Law Enforc., 1967.) 75. And see Morrow v. District of Columbia (417 P. 2d 728, 731), summarizing extensive study of handicap of arrest records in securing employment; also Report of California Assembly Interim Committee on Criminal Procedure (1961) 68; Schwartz and Sholniek, Two Studies of Legal Stigma, 10 Social Problems 133, 136 (1962); Note, cited note 1, at pp. 786, 800.

. See People v. Razezicz (206 N. Y. 249, 273); also Schware v. Board of Bar Examiners (353 U. S. 232, 241).

. See sections 1495 and 2513 of title 28 of the United States Code, providing for a “ certificate of innocence ” when a conviction is reversed on the ground of lack of evidence, as distinguished from procedural grounds.

. See e.g., McGovern v. Van Riper (137 N. J. Eq. 24); State ex rel. Reed V. Harris (348 Mo. 426); People ex rel. Gow v. Bingham (57 Misc. 66, 75) (approved in Hawkins v. Kuhne, 153 App. Div. 216, 219, affd. 208 N. Y. 555), granting injunctive relief against dissemination of fingerprints or photographs prior to conviction because of defamatory connotation; .see, also, Matter of American Soc. for Testing and Materials (231 E. Supp. 686, 689).

. See Erikson, Childhood and Society (1950) 249.

. See Watkins v. United States (354 U. S. 178, 198) and N.A.A.C.P. v. Alabama (357 U. S. 449, 463) as to government’s responsibility for indirect damage from a government-inflicted stigma.

. See People v. Savvides (1 N Y 2d 554, 556-557); Rochin v. California (342 U. S. 165, 173); Anti-Fascist Committee v. McGrath (341 U. S. 123, 172 [Frankfurter, J., concurring]); Matter of Winship, 397 U. S. 358, 363-364).

. While such an order was viewed as the maximum proper relief in some police record cases (see Roesch v. Ferber, 48 N. J. Super. 231, cited by petitioners) it appears insufficient for several reasons:
(1) employers could nevertheless secure court and arrest records through requiring a waiver of confidentiality; (2) use of the records by law-enforcement officers themselves is unjustifiable and potentially harmful; and (3) preservation of the records even with this prohibition would not erase the fear of their disclosure and the appearance of unfairness.

. See People v. Rhem (52 Misc 2d 853, 859); Matter of Public Serv. Mut. Ins. Co., 55 Misc 2d 951; cf. Murphy v. City of New York, 273 App. Div. 492). And see Matter of Chin v. Wyman (41 Misc 2d 641, 650), as to the Family Court’s implied powers.

. See statutes collected in Expungement of Adjudication Records, cited above note 1, Wash. Univ. Law Quart, at 172, 174-178; Note, Employment of Former Criminals, 55 Cornell L. J. 306, 315-316, as to California statute providing that under specified circumstances an individual is permitted to deem an arrest a nullity, so that he may validly answer in the negative the question “ Were you ever arrested? ”